IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 29, 2011

**STATE OF TENNESSEE v. RODNEY PORTER**

**Appeal from the Criminal Court for Knox County**
**No. 88774      Richard Baumgartner, Judge**

**No. E2010-01014-CCA-R3-CD - Filed July 18, 2011**

A Knox County Criminal Court jury convicted the defendant, Rodney Porter, of felony murder in the perpetration of aggravated child abuse, *see* T.C.A. § 39-13-202(a)(2) (2006), and aggravated child abuse, *see id.* § 39-15-402(a)(1).  The trial court imposed an effective sentence of life plus 25 years' incarceration.  In this appeal, the defendant challenges the sufficiency of the convicting evidence and the sentence imposed for his aggravated child abuse conviction.  Discerning no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JERRY L. SMITH and J.C. MCLIN, JJ., joined.

J. Liddell Kirk (on appeal); and Kelly S. Johnson and James L. Flanary (at trial), Knoxville, Tennessee, for the appellant, Rodney Porter.

Robert E. Cooper, Jr., Attorney General and Reporter; Lindsey Paduch Stempel, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Steve Sword and Charme Knight, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

          The defendant's convictions in this case relate to the beating death of his seven-week-old daughter, Amya Porter.  At trial, the victim's mother, Wendi Bowman, testified that the victim was born full-term and healthy on November 3, 2006.  At that time, Ms. Bowman was dating and cohabiting with the defendant, the victim's father.  On Christmas Day 2006, Ms. Bowman and the defendant broke up, and the defendant moved out of the residence.  Three days later, after getting off of work at 11:00 p.m., Ms. Bowman

became ill and asked the defendant to take her to the hospital. The defendant arrived sometime later, and the pair left the victim in the care of the defendant's mother, Wilma Cason, sometime between 3:00 a.m. and 4:00 a.m. on December 29, 2006.

After arriving at the University of Tennessee Medical Center, Ms. Bowman had emergency surgery to remove her gallbladder followed by a second surgery to remove gallstones "next to [her] liver." Ms. Bowman testified that when she awoke following her second surgery, she telephoned Ms. Cason to let her know that Ms. Bowman's mother would be coming to pick up the victim. Ms. Cason told her that the defendant had already picked up the victim and taken her to Ms. Bowman's apartment. A short time later, a nurse came in and told Ms. Bowman that the victim had been admitted into the Pediatric Intensive Care Unit ("PICU") at East Tennessee Children's Hospital ("ETCH") and that Ms. Bowman was being released from the hospital despite suffering from a "severe infection" because she "needed to get there immediately."

Ms. Bowman testified that she spoke with the defendant by telephone on her way to ETCH, and he told her that the victim had been "sleeping all day" and refusing to eat, but he did not immediately seek medical attention because "he didn't think there was anything wrong with her." Upon her arrival at ETCH, Ms. Bowman was not permitted to see the victim immediately. While in the waiting room with the defendant, Ms. Bowman was approached by representatives from the Department of Children's Services ("DCS"). Ms. Bowman said that the defendant reacted to the women's presence by saying, "Oh, my God. I knew this was going to happen."

At some point, Doctor Matthew Hill took Ms. Bowman and the defendant into a private waiting room and explained that the victim had suffered blunt trauma to her head, that she was in critical condition, and that she would likely die. Ms. Bowman said she asked the defendant why he had hurt the victim, and he denied doing so. After speaking with Doctor Hill, Ms. Bowman was permitted to see the victim. She described her appearance: "She was on a ventilator, and she had several stints holding her arms and legs apart, and she had like seven IVs going in her, and her head was real swollen." Ms. Bowman said that the victim lived through the night despite the doctor's grim prognosis.

The victim continued to survive despite her injuries and was released into Ms. Bowman's care on January 19, 2007. At that time, the victim was eating and breathing on her own. Only two days later, however, Ms. Bowman returned to the hospital with the victim because the victim had begun to aspirate food during her feedings. During the victim's week-long hospitalization, doctors placed a gastroscopy tube ("g-tube") into the victim's stomach, and from that point on, the victim's food and medications were delivered via the g-tube rather than by mouth. Also during that visit, doctors reiterated to Ms. Bowman that

the victim's prognosis remained grim. They told her that the victim "was declining fast" and that "part of her brain stem had died." Following this visit, ETCH provided home health nurses to help Ms. Bowman deliver palliative care to the victim.

Ms. Bowman took the victim back to the hospital many times during the ensuing weeks and months, culminating with a May 2006 hospital visit confirming that fluid was continuing to build in the victim's brain and that surgery to relieve the swelling would not be possible because the victim "couldn't live through surgery." Ms. Bowman said that doctors told her "to take [the victim] home and let her die." Ms. Bowman testified that she took the victim home but then returned to Doctor Anna Kosentka, a pediatric neurologist, who told her the victim should be prescribed "some kind of [h]ospice medication." Doctor Kosentka prescribed morphine, which Ms. Bowman filled the following day and began to administer at the dosage provided by Doctor Kosentka. Ms. Bowman said that during the last days of her life, the victim "cried all the time" and "had posturing seizure-like movements" that caused her entire body to "cramp up." The victim eventually succumbed to her injuries on June 6, 2007.

Wilma Cason, the defendant's mother, testified that she agreed to keep the victim on December 29, 2006, while the defendant took Ms. Bowman to the hospital. At approximately 8:00 a.m., the defendant picked up the victim from Ms. Cason's place of employment. At some point during the day, the defendant telephoned Ms. Cason and asked her to babysit the victim later that evening. She agreed, and the defendant dropped the victim off at Ms. Cason's residence at approximately 6:45 p.m. The defendant left after approximately 10 minutes, and Ms. Cason went to get the baby out of her car seat. Ms. Cason testified that at that time, the victim was pale and did not appear to be reacting to her voice. She said she immediately telephoned the defendant and told him something was wrong with the victim and that she needed to be seen by a doctor. Ms. Cason stated she then telephoned her daughter, who advised her to call 9-1-1. The defendant came back a short time later and took the victim to the hospital. Ms. Cason denied telling the defendant that the victim was jaundiced.

Doctor Paul B. Schneider, the pediatrician who treated the victim upon her arrival at ETCH on December 29, 2006, testified that the victim "had a decreased level of consciousness. Her pupils were dilated. She was not responsive at all. Her soft spot was bulging. She was very tachycardi[c]. So her heart rate was around 200. She was breathing very fast and erratically, and she had bilateral retinal hemorrhages noted on microscopic examination." Doctor Schneider, who took a history from the defendant that included a denial of any trauma to the victim, stated that the victim's "presentation was very consistent with shaken baby [syndrome]." Doctor Schneider ordered a computerized tomography ("CT") scan of the victim's brain, and the scan revealed "diffuse cerebral edema and acute

midline subdural hematoma, bone fragments along the . . . right lamboid suture and probable small frontal contusions versus hemorrhage." Doctor Schneider testified that the injuries revealed in the CT scan were consistent with his initial diagnosis of shaken baby syndrome. Doctor Schneider said that the victim's condition upon her admission to the hospital was "[v]ery critical" and that, once her airway was stabilized, she was transferred to the PICU under a "very grim" prognosis. He said that at that point it "was not clear if she was going to die or to survive and have minimal functioning capacity."

Doctor Schneider testified that neither childbirth nor cardiopulmonary resuscitation would have caused the victim's retinal hemorrhaging, but a serious fall had the potential to result in retinal hemorrhaging. He added, however, that it was "very unlikely" that the victim's injuries could have been caused by the defendant's dropping the victim from his lap onto a carpeted floor.

Doctor Matthew Hill, a Pediatric Intensive Care Specialist on call when the victim was brought in, described the victim's condition, "When she first arrived in the hospital, she was having respiratory distress. She was ashen and pale. She was having agonal respirations. . . . Her pupils, when she arrived in the door, were fixed and dilated, meaning they did not respond to light." Doctor Hill explained that agonal breathing "is an abnormal breathing stimulated by the lower brain stem. It's a . . . type of breathing that's an indicator of severe neurologic injury." He testified that a CT scan "revealed a pretty significant bilateral hemorrhage in the left parietal and small little hemorrhages in the frontal lobe" as well as a "markedly abnormal" amount of "swelling of the entire brain." He noted that the victim's brain injury was particularly significant because "the entire cortex was entirely involved." Doctor Hill testified that the victim also had bilateral retinal hemorrhaging, a symptom he had "never found" in any pathology other than shaken baby syndrome.

Doctor Hill opined that the victim's injuries were "non accidental trauma. This was consistent with what we call 'shaken baby syndrome.'" He testified that evidence of the victim's injuries would have appeared "within an hour or two" and that the injuries could have been inflicted "anywhere within two hours to 12 hours" of her arrival at the hospital. He said that he had "not seen this compound of injuries, the type of injuries . . other than as a shaken baby without a significant history of trauma, like a motor vehicle accident or something like that." A fall from accidental dropping or even a fall from bouncing off of a bed would not have caused such severe injuries.

In gathering a history, he specifically asked whether the victim had experienced any trauma, and the defendant told him that she had not. Doctor Hill then performed blood work and several scans to rule out various causes for her symptoms as well as a spinal tap

-4-

to rule out an infection. The spinal tap revealed "a massive amount of protein in her [cerebral spinal fluid], which [indicated] that she had significant loss of brain cell function, and her brain[] . . . cells were dying at that time." Doctor Hill described the amount of protein present in the victim's cerebral spinal fluid as "as high as [he had] ever seen in a tap." Doctor Hill said that at that point, there was "not much" medical personnel could do other than supportive care because they could not "reverse the injury that's already happened to the brain." He testified that medical personnel tried a variety of interventions designed to limit the extent of the injury to "preserve injured brain that's still viable," all to no avail. He explained, "Based upon her presentation and the degree of edema, . . . [her] prognosis was very, very poor. The only thing that was keeping her alive at that time was the fact that she was seven weeks old, and . . . the plates of her skull had not sutured together." He elaborated that the space between the plates of the victim's skull allowed the pressure in her brain to expand her head outward and relieve pressure on the brain stem, which permitted some brain stem function. He said it was simply "too late" to save the victim by the time she arrived at the hospital.

Doctor Hill testified that he told both the defendant and Ms. Bowman that the victim had "suffered a traumatic injury" and that she likely would not survive. He said that Ms. Bowman "was hysterical" at the news but could not recall the defendant's reaction. He recalled that he discussed with Ms. Bowman "how far she wanted to go with [the victim's] care and . . . treatment" given her poor prognosis and the fact that "[s]he was going to be severely, severely impaired if she survived." "After four or five days," it became apparent to medical personnel that the victim "was going to survive these injuries in a very bad neurologic state."

Doctor Hill said that the victim was eventually discharged from the hospital after she was weaned from a ventilator. He said he was not, however, surprised to learn that the victim had died six months later "[g]iven the degree of her neurologic injury." He said that "usually, these children die of an aspiration or pneumonia episode" related to the initial brain injury.

Knoxville Police Department ("KPD") Officer Bryan Davis testified that he was called to ETCH on December 29, 2006, and informed by medical staff that the victim had suffered "severe trauma to the head and a possible brain injury." Officer Davis said that he spoke with the defendant, who initially denied that the victim had suffered any trauma. Later during the initial interview, however, the defendant told the officers present "that during a diaper change the child was laying [sic] in his lap and that at some point he reached to grab . . . some . . . item, and when he did, the child accidentally fell off his lap onto the floor." Officer Davis said that the defendant claimed that the victim cried a bit after the fall but that he was able to console her eventually.

Officer Davis said that he related the defendant's version of events to medical staff, who told him "that there was no way" that such a fall "could have caused the injuries that the victim suffered." At that point, Officer Davis returned to the small waiting room where he had conducted the initial interview with the defendant and provided the defendant with *Miranda* warnings before questioning him a second time. During this second interview, the defendant maintained that he simply dropped the victim from his lap onto the carpeted floor during a diaper change. At that point, the officers left the room to consider their options. Following a brief discussion, KPD Investigator Greg McKnight returned to the waiting room to speak to the defendant a third time unaccompanied by other officers.

Investigator McKnight testified that he went into the waiting room to speak with the defendant "man to man" in an attempt to get the defendant to reveal the true origin of the victim's injuries. Investigator McKnight said that during this third interview, the defendant "finally admitted what he had done," telling the officer "that the baby wouldn't stop crying. He said he had the baby in his arms, and he said he just lost it and threw the baby on the bed, and the baby hit - - from the bed, the baby hit on the floor, against the wall." The defendant then provided the following statement written in his own handwriting:

> Amya Neveah Porter daughter of Rodney D. Porter. I love my baby very true and deep and I am making this statement in hope and belief that God will rescue my baby to[] live and see the beginning of her life. When Amya started to cry after I dropped her in the middle of a pamper change and I couldn't soothe her, I then became short in my parental patience and took her to the bedroom and tossed her on the bed but she bounced off and onto the floor where her head hit the wall. No one reading this statement has to forgive me but my daughter[.] I will care to be forgave by mostly. May God take this and make me a great father to my only daughter/child.

Investigator McKnight adamantly denied telling the defendant what details to provide in his written statement.

Pediatric Opthamologist Doctor Gary Gitschlag examined the victim on December 30, 2006, and testified that "she showed a significant amount of hemorrhaging [that] more or less covered the inside of the retina." He stated that although there are "myriad" causes of retinal hemorrhage, in cases of child abuse, retinal hemorrhage occurs along with intercranial bleeding. He testified that the "massive" amount of hemorrhaging present in the victim was consistent with child abuse. He said the victim's injuries were "strongly suggestive of shaken baby syndrome" and were not likely caused by "a simple fall

-6-

from the bed or something." He said that although "minor hemorrhages" can be caused by falls, "even massive car injuries with crush" do not cause "that sort of massive retinal hemorrhage in an infant this size." He emphasized, ""[M]assive subdural hemorrhages with multiple fractures and mass retinal bleeding in a three month old dying of bleeding diathesis would be indicative of a shaken baby syndrome. I can think of no other pathology."

Doctor Gitschlag last examined the victim in March 2006, and at that time "she still showed significant vitreal retinal hemorrhage." Doctor Gitschlag said the victim needed surgery to "remove the blood from the chamber, and if there's a detached retina, try to reattach it." He recalled that the surgery was not performed "because of her prognosis as far as longevity . . . the risks were not sufficiently outweighed by the benefits."

Doctor Marymer Patricia Perales, a pediatrician with a specialty in "child abuse pediatrics," which she said "focuses in on the area of child abuse," testified that she became involved in the victim's case after the victim survived her first night in the PICU. At that time, the victim's brain was swollen and there was evidence that she had suffered a "hypoxic event," meaning that her brain had been deprived of oxygen. The victim also had "diffuse retinal hemorrhages, meaning [hemorrhages were present] everywhere you looked in her eye." After examining the victim and her medical records, Doctor Perales concluded that the victim had suffered "inflicted head trauma," meaning she had received a non-accidental injury. Doctor Perales said that the force required to inflict such an injury was "enough that if anyone witnessed the force that was being used they would know that it was inappropriate force or excessive force." She adamantly maintained that an accidental fall could not have caused the victim's injuries.

Once the victim was moved to the regular patient floor, Doctor Perales was one of her treating physicians. She discharged the victim after the victim passed a "barium swallow" test, but the victim was readmitted to the hospital two days later "for gagging and choking." At that point, the victim's prognosis was very grim. She explained, "We take care of children who have brain injury a lot, and you know, again, they may recover and have a period of doing better, but they will always continuously decline, and at some point their brain will say, I cannot do this anymore, and it will stop." Doctor Perales explained that the victim's brief period of improvement was due to the decrease in swelling but that later CT scans showed that the victim's "brain was no longer there. There were no brain cells there. There was no myelin sheath there to myelinate. There was nothing there."

Doctor Perales testified that upon the victim's final readmission to the hospital, it was clear that the victim's death was imminent. Doctor Perales testified that she was aware that the victim was prescribed morphine just before her death, a medication that Doctor Perales felt was medically necessary because the victim "was very spastic" and "was in pain

for that and other reasons." Doctor Perales testified that she was not at all surprised when the victim died because she was certain from the beginning that the victim would eventually succumb to her injuries.

Pediatric Neurologist Doctor Anna Kosentka testified that when she first examined the victim, the victim was "comatose, responsive only to major painful stimulation . . . and her pupils were sluggishly reactive." After obtaining a full history, Doctor Kosentka concluded that the victim "was involved in some traumatic event." Doctor Kosentka testified that she continued to consult in the victim's treatment during her initial hospital stay. During that time, she performed "three or four" electroencephalograms ("EEG") on the victim, each of which showed abnormal brain activity and "confirmed abnormal findings on [the victim's] CT."

Doctor Kosentka also treated the victim following her initial discharge in January 2007 and during her subsequent hospitalizations and last saw the victim at the end of May 2007. She testified that the victim's prognosis from the beginning was "extremely poor," which Doctor Kosentka explained to mean that "based on several tests, [magnetic resonance imaging] of the brain, a consultation with the neurosurgeon, several EEGs, and her clinical presentation suggested that her life expectation [was] short, and she did not have any . . . signs for recovery from this injury."

Doctor Kosentka stated that despite some initial slight improvement in her symptoms, the victim's "brain function did not improve clinically" and, in fact, continued to decline until her "brain activity was minimal." The victim continued to have seizures, described "as arching back and episode of muscle stiffening" and "occasionally some jerking movements with the face, sometimes with the legs." Doctor Kosentka prescribed both clonazepam and phenobarbital for the seizure activity. During the victim's final hospitalization, the victim "presented with episodes of pain" manifested in "extreme irritability, episodes of screaming, crying," leading Doctor Kosentka to prescribe morphine "[t]o control her pain and to provide some comfort" for the victim. Doctor Kosentka testified that when she prescribed the morphine, she specifically told Ms. Bowman to discontinue giving the victim hydrocodone for pain.

Karen Sharp, a nurse at ETCH, testified that she was assigned to provide home health assistance to the victim as part of the "interval program" to help the family "through the process" of the victim's terminal illness. She stated that she showed the victim's family how to operate the g-tube and also provided some "compassionate care," which she described as "like a [h]ospice for children." Ms. Sharp said that in June 2007, the victim had more bad days than good days, was unable to tolerate her feedings, and was "staying irritable all the time and crying." On the day that she died, the victim experienced several episodes where

-8-

she stopped breathing for a few seconds or minutes and then would take "a big gasp and start breathing again." Ms. Sharp testified that such behavior was a normal part of the dying process. On that day, the victim was being given morphine for irritability at the level prescribed by Doctor Kosentka. Ms. Sharp said that she could not recall whether she or Ms. Bowman administered the final dose of morphine to the victim but that she did not generally administer the victim's medications.

Knox County Chief Medical Examiner Doctor Darinka Mileusnic-Polchan, who performed part of the victim's "complex" two-part autopsy, testified that evidence of bruising remained on the victim's brain even at the time of the autopsy, indicating a "severe impact" injury. Doctor Mileusnic-Polchan stated that because of the injury and the "tremendous swelling of the brain," the victim's "sutures" or soft-spots never came together. Further examination revealed a healing subdural hemorrhage that was an "indication there was a severe head trauma." Doctor Mileusnic-Polchan explained that the brain "should be nice, healthy looking gray, tan, oval sort of organ that has a lot of gyri, like a little nubbins, and a sulci, the little crevices that separate them." The victim's brain, by contrast, was "essentially, an empty sack. There's no normal brain tissue left." She said, "The only structure that really has some normal appearance would be the . . . distal brain stem, the lower brain stem and the spinal cord itself, and even there we have . . . some shrinking." She explained that the "disappearance of the brain substance was a gradual process." She said that the victim's injury was irreparable and irreversible and that the fact that she lived as long as she did "would indicate really good care."

Doctor Mileusnic-Polchan testified that in addition to the injuries that indicated a lack of oxygen to the brain, there was an area of bruising that indicated a direct impact "in the area of the forehead." She said that toward the end of her life, the victim "had no brain control whatsoever, that the brain was not there. The only thing that really maintained her life was some vital centers that remained in the brain stem for a while, but even that would disappear over time." She said that the victim "could feel the pain, but she could not process the pain the way we consciously process the pain."

Doctor Mileusnic-Polchan testified that examination of the victim's eyes confirmed the presence of retinal hemorrhaging and "tremendous scarring, tremendous change, that was clearly indicative the child was blind. Of course, she was blind because of the head and brain trauma, but even if that hadn't been the case, the eyes could not see any more." Doctor Mileusnic-Polchan said that the victim's constellation of injuries could not have resulted from a typical household fall and necessarily resulted from blunt force trauma to the head.

Doctor Mileusnic-Polchan testified that the victim had an "extremely high

amount" of morphine in her system at the time of her death, enough to "kill any individual, adult, let alone the child." She said that the official cause of death was "the morphine intoxication due [to] global hemispheric microsis due to blunt head trauma which is the cause. It was of child abuse. So, yes, the morphine was listed as the final kind of mechanism that pushes her over the edge." She attributed the high level of morphine to "some sort of error in dosing." Nevertheless, she concluded that even without the morphine, the victim would "most likely" have died "relatively soon because she was developing pneumonia." She said that, in any event, the victim would "certainly" have died from the brain injury.

Following Doctor Mileusnic-Polchan's testimony, the State rested, and the defendant took the stand. He testified that after taking Ms. Bowman to the hospital, he picked the victim up from Ms. Cason's house and took her with him to his Aunt Minnie Ruth's house. He said he left the victim with his aunt and did not return to pick her up until after midnight. He then took the victim to Ms. Bowman's apartment, where he changed her diaper and put her to bed. The defendant said that the victim awoke at 3:00 a.m., and he "fed her a little bit." He testified that both he and the victim went back to sleep and slept until 9:30 a.m. At that time, he gave the victim a bath. The defendant testified that while he was getting the victim out of the bath, he "accidentally dropped her" and "she fell head first" onto the floor of the bathroom. He said that the baby cried for 10-15 minutes but eventually calmed down.

The defendant testified that after the victim calmed down, he dressed her and returned to his Aunt Minnie Ruth's house. There he lay the sleeping victim on one couch while he went to take a nap on the other couch. The defendant said that he woke up at approximately 2:00 p.m. and asked his aunt to watch the baby while he and his cousin went to visit a mutual friend. He stated that the baby was asleep when he left and was still asleep when he returned to pick her up a couple of hours later. From his Aunt Minnie Ruth's, the defendant took the victim to Ms. Cason's so that she could watch the baby while he went out. He said that he did not take the victim out of her car seat before leaving Ms. Cason's residence. Shortly after he left, Ms. Cason called and told him that he needed to take the victim to the hospital because "she's yellow, look like she got jaundice or something."

The defendant testified that he took the victim to ETCH, and she was immediately taken into a "small examination room" where they remained for approximately 30 minutes while the doctor examined the victim. He claimed that doctors never told him the victim was in dire condition and that he never suspected "anything [was] wrong with her but what [his] mama said." At some point, doctors took the victim away for testing but did not tell him that she was gravely ill. The defendant claimed that a woman that he did not know came into the room, told him that he should not leave the room, and then remained there with him and his sister. He said that the woman eventually directed him and his sister

to a waiting area just outside the entrance to the PICU and that he remained there for approximately half an hour before he was taken into another room.

The defendant said that while he waited in this smaller room, officers arrived and questioned him about the injuries. He testified that they told him that the victim had various fractured bones and asked him how she had come to be injured. He claimed that he eventually told them the story about throwing the victim onto the bed because he felt "like [he] had to give these people some kind of answer to something." He said he "felt responsible" for the victim's condition even though he had not himself inflicted any injury and that Officer McKnight had provided him with the "story" of his throwing the victim onto the bed. The defendant stated that the story was his attempt to protect his aunt or cousin in the event that they had injured the baby. He maintained that he had never purposely injured the victim and that any harm "was an accident."

During cross-examination, the defendant described dropping the victim from a height of 44 inches onto the bathroom floor and admitted that he never told anyone that he had dropped the victim in the bathroom. The defendant could not explain why he would willingly provide a false story that he dropped the victim while changing her diaper but would not tell authorities or medical personnel that he had actually dropped her in the bath.

The defendant testified that despite their testimony to the contrary, neither Doctor Hill nor Doctor Schneider communicated to him the victim's condition or her dire prognosis. He claimed that he continued to believe the victim was suffering from jaundice until he was questioned by police. He also said that despite her testimony to the contrary, he never told Ms. Bowman to come with him because the doctor wanted to talk with them about the victim. The defendant said that when he realized the victim was seriously injured, he "figured that something had to take place while she wasn't in [his] care."

Based upon this proof, the jury convicted the defendant as charged of first degree murder committed during the perpetration of aggravated child abuse and aggravated child abuse. By operation of law, the trial court imposed a life sentence for the first degree murder conviction. *See* T.C.A. § 39-13-208(c). Following a sentencing hearing, the trial court imposed a sentence of 25 years' incarceration to be served consecutively to the defendant's life sentence.

In this appeal, the defendant challenges the sufficiency of the convicting evidence and the propriety of the sentence imposed for his aggravated child abuse conviction. We will consider each claim in turn.

-11-

*I. Sufficiency*

The defendant claims that the evidence adduced at trial was insufficient to support his convictions because the evidence did not conclusively establish "what actually happened to the victim to cause the severe injuries [the victim] sustained." The State asserts that the proof established that the defendant inflicted blunt force trauma to the victim's head and that this trauma eventually resulted in her death.

We review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). In *Dorantes*, our supreme court specifically rejected the holding in *State v. Crawford*, 470 S.W.2d 610 (Tenn. 1971), requiring that in a wholly circumstantial evidence case the State "prove facts and circumstances 'so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt.'" *Id.* at 380 (quoting *State v. Crawford*, 470 S.W.2d 610, 612 (Tenn. 1971)). Accordingly, the State is no longer required to "exclude every other reasonable hypothesis save the guilt of the defendant" to obtain a conviction based solely on circumstantial evidence and need only establish the constitutionally required standard of proof beyond a reasonable doubt. *Id.* at 381.

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

First degree murder, as is applicable in this case, is defined as "[a] killing of another committed in the perpetration of . . . any . . . aggravated child abuse." T.C.A. § 39-13-202(a)(2).

"A person commits the offense of aggravated child abuse . . . who commits child abuse, as defined in § 39-15-401(a) . . . and . . . [t]he act of abuse . . . results in serious bodily injury to the child." *Id.* § 39-15-402(a)(1). Code section 39-15-401 provides that a

person commits child abuse "who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury." *Id.* § 39-15-401(a).

The evidence adduced at trial established that while in the exclusive care and control of the defendant, the seven-week-old victim suffered severe blunt force trauma that caused a severe traumatic brain injury that left her in a progressively declining state for five months and eventually led to her death. Each of the victim's treating physicians as well as the medical examiner testified that the victim's constellation of injuries was severe and indicative of child abuse. Doctors Hill, Schneider, Gitschlag, Perales, and Kosentka each testified that the victim's injuries were consistent with shaken baby syndrome. Doctor Mileusnic-Polchan testified that the only reason she could not conclusively provide a diagnosis of shaken baby syndrome was because the victim lived a little more than five months after her injuries.

The defendant provided three separate accounts of how the victim came to be injured, first that he dropped her onto the carpeted floor during a diaper change, second that he dropped her during a diaper change and then threw her onto the bed when she could not be consoled, and third that he dropped her onto the floor after giving her a bath. Each of the testifying experts said that the victim's injuries could not have been attributed to a typical household fall. Moreover, the defendant contended for the first time at trial that the victim had been in the care of someone other than himself when she was injured.

Although the defendant contends that the jury could not have concluded from the proof presented what "exactly" happened to the victim, the jury need not have made such a determination to conclude that the defendant had caused her death. The jury need only have concluded beyond a reasonable doubt that the defendant knowingly and by non-accidental means treated the victim in a manner that caused her serious bodily injury that resulted in her death. The defendant's confession coupled with the expert testimony regarding the severity of the victim's injuries and their consistency with a diagnosis of shaken baby syndrome overwhelmingly supports the verdict of the jury.

## II. Sentencing

The defendant also challenges the 25-year sentence imposed for his conviction of aggravated child abuse, claiming that the trial court failed to properly "articulate a weighing of the[] enhancement factors along with any mitigating factors." Specifically, he argues that the trial court should have considered "that there was no evidence that the [d]efendant intended to harm the victim, or was aware that she had been harmed prior to taking her to the hospital."

We need not tarry long over the defendant's claim because although prior versions of the Sentencing Act provided as a ground for appeal that "[t]he enhancement and mitigating factors were not weighed properly, and the sentence is excessive under the sentencing considerations set out in § 40-35-103," i*d.* § 40-35-401(b)(2) (2003), the 2005 amendments to the Sentencing Act removed this provision, and the Code no longer provides for appellate review of the weight assigned to the now advisory enhancement and mitigating factors, *see id.* § 40-35-401(b)(1)-(3) (2006) (designating grounds for appeal of a sentence). Accordingly, we affirm the sentence imposed by the trial court.

*Conclusion*

Finding no deficiency in either the evidence supporting the defendant's convictions or the sentence imposed by the trial court, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE